IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IN RE: ROBERT COE AND SUSAN POKRIVNAK, Debtors    No. 5:11-bk-72274
Ch. 7

UNITED STATES TRUSTEE                               PLAINTIFF

v.                            5:12-ap-7110

SUSAN MARY POKRIVNAK                      DEFENDANT

## ORDER AND OPINION

### Introduction

Before the Court is the *United States Trustee's First Amended Complaint to Revoke Discharge of Defendant* that was filed by the United States trustee on March 21, 2013, and the *Answer to United States Trustee's Amended Complaint to Revoke Discharge of Defendant* that was filed by the debtor, Susan Mary Pokrivnak, on May 13, 2013. The basis for the United States trustee's complaint is the debtor's alleged failure to turn over to the chapter 7 trustee[1] estate property that she received as the beneficiary of a life insurance policy within 180 days from the filing of her petition. The Court conducted a trial on August 15, 2013. Appearing on behalf of the debtor were Stanley V. Bond and Erin H. Curry; appearing on behalf of the United States trustee was Richard H. Sforzini Jr. At the conclusion of the trial the Court took the matter under advisement. For the reasons set forth below, the Court finds that the United States trustee has met her burden of proof, grants the relief sought by the United States trustee, and revokes the debtor's discharge that the Court entered on August 23, 2011.

---

[1] To avoid confusion, the Court will always refer to the United States trustee as the "United States trustee" in this opinion. The chapter 7 panel trustee is referred to as "the trustee" or "Lee."

**Jurisdiction**

The Court has jurisdiction over this case and proceeding under 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(1), and it is a core proceeding under 28 U.S.C. § 157(b)(2)(J). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**Course of Proceeding**

Susan Mary Pokrivnak filed for relief under chapter 7 of the bankruptcy code on May 14, 2011. Her § 341(a) meeting of creditors was scheduled, held, and concluded on June 21, 2011; John T. Lee was the panel trustee assigned to the debtor's case and the trustee who conducted the meeting of creditors. Lee deemed the case a no-asset case and the debtor received her discharge on August 23, 2011. The debtor's bankruptcy case was closed on September 14, 2011. On July 31, 2012, after receiving information that the debtor had received money through an inheritance,[2] the United States trustee filed her *United States Trustee's Motion to Reopen Case and Direct Appointment of Trustee*, which the Court granted on August 21, 2012. Lee was reappointed as the case trustee. The United States trustee filed her initial complaint seeking to revoke the debtor's discharge under § 727(d)(2) on September 6, 2012, and her amended complaint on March 21, 2013.

**Revocation of Discharge Under 11 U.S.C. § 727(d)(2)**

Section 727 of the bankruptcy code concerns, generally, the debtor's discharge in a chapter 7 case. Subsection (d) deals specifically with the revocation of a discharge that was previously granted. The pertinent section raised by the United States trustee seeking to revoke the discharge of the debtor reads as follows:

> (d) On request of the trustee, a creditor, or the United States trustee, and after

---

[2] As will become clear through the parties' stipulation of facts for trial, the debtor actually received life insurance proceeds on account of her mother's death rather than an inheritance. Any reference to "inheritance" in this opinion is based on the testimony or evidence received by the Court; however, any such reference, in fact, refers to the life insurance proceeds.

> notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if--
>
> . . .
>
>> (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee.

11 U.S.C. § 727(d).  According to the United States trustee, the debtor received life insurance proceeds within 180 days of filing her chapter 7 petition and failed to report the acquisition or deliver the proceeds to the trustee.

The denial or revocation of a discharge must be closely scrutinized due to the potential devastating impact on a debtor.  The Court is aware that "[d]enying a discharge to a debtor is a serious matter not to be taken lightly by a court."  *McDonough v. Erdman* (*In re Erdman*), 96 B.R. 978, 984 (Bankr. D.N.D. 1988).  Generally, a denial of discharge is a "'harsh and drastic penalty.'" *Korte v. U.S. Internal Revenue Serv.* (*In re Korte*), 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001) (quoting *Am. Bank v. Ireland* (*In re Ireland*), 49 B.R. 269, 271 n.1 (Bankr. W.D. Mo. 1985)).  Because of the severe nature of the remedy provided for in § 727, the statute's provisions "'are strictly construed in favor of the debtor.'" *In re Korte*, 262 B.R. at 471 (quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 589-90 (Bankr. D. Minn. 1987)); *In re Erdman*, 96 B.R. at 984.

The burden of proof is on the objecting party, in this case the United States trustee.  She must prove, by a preponderance of the evidence, both the acquisition of the property which becomes property of the estate and the knowing and fraudulent failure to either report the acquisition or deliver the property to the trustee.  *In re Korte*, 262 B.R. at 471; *see also In re Yonikus*, 974 F. 2d 901, 905 (7th Cir. 1992); *In re Barr*, 207 B.R. 168, 173 (Bankr. N.D. Ill. 1997).  In the context of a determination of dischargeability of debt, the Eighth Circuit Bankruptcy Appellate Panel defined fraud as

> "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another--something said, done or omitted with the design of perpetrating what is known to be a cheat or

deception." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995) (quoting 3 Collier on Bankruptcy ¶ 523.08[5], at 523-57 to 523-58 (footnote omitted)).  "The concept of actual or positive fraud consists of something said, done or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." *In re Stentz*, 197 B.R. 966, 981 (Bankr. D. Neb. 1996).

*Merchants Nat'l Bank v. Moen* (*In re Moen*), 238 B.R. 785, 790-91 (B.A.P. 8th Cir. 1999).  If the United States trustee meets her burden, the burden shifts to the debtor to explain the failure to either report the acquisition or deliver the property to the trustee.  *In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984).  The debtor carries the ultimate burden of persuasion.  *Grant v. Sadler* (*In re Sadler*), 282 B.R. 254, 262 (Bankr. M.D. Fla. 2002).

Also of consequence in this case is the fact that the debtor failed to appear at this trial. Counsel for the debtor advised the Court that the debtor was unable to afford to come to the trial.  Federal Rule of Bankruptcy Procedure 4002 (a)(2) states that, "in addition to performing other duties prescribed by the Code and rules, the debtor shall . . . (2) attend the hearing on a complaint objecting to discharge and testify, if called as a witness."  In some instances, a debtor's non-appearance in a trial in which a party is objecting to the debtor's discharge is sufficient basis by itself for the court to deny the debtor's discharge if the objecting party presents a prima facie case.  *See Hackert v. De Ronde* (*In re De Rhonde*), No. 10-30138-als, 2012 WL 5246916, at *3 (Bankr. S.D. Iowa Oct. 24, 2012) (collecting cases).  The cases cited by *De Rhonde* typically contemplate an additional motion by the objecting party, for instance, a motion for default judgment.  However, non-attendance alone may be grounds for the Court to deny the debtor's discharge. *County Real Estate Corp. v. Ishahak* (*In re Ishahak*), 130 B.R. 16, 20 (Bankr. E.D.N.Y. 1991).

**Findings of Facts**

    **Stipulations by the parties**

The parties filed their *Stipulated Facts For Trial* on August 13, 2013, which state:

    1.    On May 14, 2011, Pokrivnak filed her Voluntary Petition for bankruptcy in the United States Bankruptcy Court for the Western District

of Arkansas (Fayetteville Division), Case No. 5:11-bk-72274
["Bankruptcy Case" (see Doc. No. 1 therein)].

2.      Pokrivnak's 341 meeting in the Bankruptcy Case was scheduled
for June 21, 2011 and was held and concluded on that date; the 341
meeting was conducted by Chapter 7 Panel Trustee, John T. Lee ("Trustee
Lee").

3.      On August 23, 2011, Pokrivnak received her discharge in the
Bankruptcy Case (see Doc. No. 13 therein).

4.      On September 14, 2011, Pokrivnak's Bankruptcy Case was closed
(see Doc. No. 15 therein).

5.      On September 22, 2011, Pokrivnak's mother, Margaret Alice
Flaherty Pokrivnak ("Mother"), died in Bentonville, Arkansas
(Pokrivnak's Mother was 93 years old).

6.      Approximately two weeks after her mother died (sometime in
October 2011), Pokrivnak received an "inheritance" from her Mother's
estate.

7.      The "inheritance" Pokrivnak received was actually life insurance
money or proceeds ("life insurance money" or "life insurance proceeds")
in the amount of $101,000.00 paid to Debtor as a result of her mother's
death.

8.      November 10, 2011 was the $180_{th}$ day after Pokrivnak filed her
Voluntary Petition in the Bankruptcy Case.

9.      On December 29, 2011, Pokrivnak opened a personal bank account
with Loyal Bank Limited in Saint Vincent, West Indies ("Loyal Bank").
Pokrivnak deposited the life insurance money (her "inheritance"), or part
of it, in Loyal Bank.

10.     In March of 2012, Pokrivnak moved from Arkansas to
Pennsylvania.

11.     On April 12, 2012, Pokrivnak entered into a Sales Agreement to
purchase property located at 126 Briarwood Drive in the Penn Hills area
of Pittsburgh, Pennsylvania.

12.     In May of 2012, Pokrivnak consummated the purchase of the
house located at 126 Briarwood Drive, using the life insurance money (the

"inheritance" from her mother).  Pokrivnak was issued a title insurance policy for $54,500.00 at the closing of the sale.

13.     In May of 2012, Pokrivnak moved into her new house at 126 Briarwood Drive.

14.     On or about July 17, 2012, Trustee Lee wrote a letter to Pokrivnak making formal demand for turnover of the house ("estate property") and an accounting.

15.     On July 31, 2012, the United States Trustee filed a motion (the "July 31st motion") to re-open Debtor's Bankruptcy Case (see Doc. No. 16 therein).

16.     On August 21, 2012, the Bankruptcy Court entered an order granting the United States Trustee's July 31st motion, re-opening Pokrivnak's Bankruptcy Case, and directing  the appointment of a trustee (see Doc. No. 18 therein).  Trustee Lee was re-appointed as trustee.

17.     On August 31, 2012, Trustee Lee filed an Adversary Proceeding (Case No.: 5:12-ap-07108) ("Lee AP") against Pokrivnak for turnover of estate property pursuant to 11 U.S.C. Section 541(a)(5)) (see Lee AP Doc. No. 1 therein).

18.     On September 6, 2012, the United States Trustee filed an Adversary Proceeding (Case No.: 5:12-ap-07110) ("UST AP") against Pokrivnak for revocation of her bankruptcy discharge pursuant to 11 U.S.C. 727(d)(2)) (see UST AP Doc. No. 1 therein).

19.     On April 30, 2013, Trustee Lee filed his Amended Motion to Approve Settlement and Notice to Creditors Thereof in Trustee Lee's Adversary Proceeding (see Lee AP Doc. No. 33 therein).

20.     On May 28, 2013, the Bankruptcy Court entered an Order Granting Trustee's  Motion to Approve Settlement and Notice to Creditors Thereof in Trustee Lee's Adversary Proceeding (see Lee AP Doc. No. 34 therein).

According to the parties' stipulation of facts, the debtor acquired proceeds from a life insurance policy in the amount of $101,000 within 180 days of the filing of her petition. Under § 541, property acquired by the debtor as a beneficiary of a life insurance policy within 180 days of the filing of a petition is property of the estate.  11 U.S.C. § 541(a)(5).

Based on this stipulation, the Court finds that the United States trustee proved by a preponderance of the evidence that the debtor acquired property that became property of the estate.

### Meeting of creditors--June 21, 2011

At trial, the United States trustee introduced an abstract of the testimony from the debtor's meeting of creditors that was held on June 21, 2011.  At the meeting, the following exchange took place between Lee and the debtor, who was under oath:

> Trustee Lee: "If you become entitled to receive something because of inheritance within 6 months after you file your bankruptcy, do you promise me you will tell your attorney who will tell me?"

> All debtors: "Yes."

> Ms. Pokrivnak asked: "I have a question about that.  If someone should die within 6 months and making me eligible for an inheritance, would that be the . . . "

> Trustee Lee: "If you're going to get something because of that person's death and that even if you don't get it in 6 months but you become entitled to receive it within 6 months, that's what I'm talking about."

> Ms. Pokrivnak: "Then it would have to go to probate?"

> Trustee Lee: "I can't answer that question."

> Mrs. Pokrivnak: "If my mother died . . . "

> Trustee Lee: "Your mother died?  Recently?"

> Mrs. Pokrivnak: "No, if she died within 6 months."

> Trustee Lee: "And you're entitled to receive something as a result of her death and that occurs within the next 6 months . . . "

> Mrs. Pokrivnak: "I'm expecting to, yes."

> Trustee Lee: "You need to tell Mr. Conner who will tell me.  This happens more often than you folks might imagine."

(Pl's. Ex. 5.)  The debtor acknowledged the accuracy of the transcript by affixing her

signature on the abstract.  Lee testified at the trial that it was unusual for a debtor to have such specific questions regarding a possible inheritance.

### Testimony of Robert Jeffrey Conner

The debtor's initial bankruptcy counsel, Jeff Conner, testified at the trial.  According to Conner, the debtor called Conner's office on September 22, 2011, and advised Conner that her mother had died and she was getting an "inheritance."  Conner testified that the debtor seemed agitated when he explained that the money she received needed to be turned over to the trustee.  Conner told her that she would need to provide him with the specific information on the inheritance, along with a copy of the will and any other relevant information.  The debtor told Conner that it would be unfair if she were required to turn over the money to the trustee.  Conner testified that their conversation was adversarial in this regard and that the debtor was not happy about what he was telling her.[3]  As it turned out, that was the last time Conner ever spoke with or communicated with the debtor.  On October 18, 2011, the debtor's brother faxed to Conner copies of the will and two account statements, which indicated more than $50,000.00 in each account.  Conner said he was not clear at that time as to the source of the money.  The debtor called Conner's office and made an appointment with Conner for October 20, 2011, to go over these matters.  However, on October 20, the debtor failed to show up for her appointment with Conner.  As a result of the debtor not keeping her appointment, Conner testified that the debtor's case "fell through the cracks" and he simply forgot to advise the trustee of the conversations he had with the debtor regarding a possible inheritance.

The debtor did not appear at trial to rebut Conner's testimony and the Court finds

---

[3]  Conner also testified that the debtor signed a document for the trustee which acknowledged the debtor's requirement to report any inheritance and turn the property over to the trustee if entitlement came within six months after filing.  Conner also said that he explained that requirement to the debtor as well.  The debtor also admitted in her answers to the United States trustee's interrogatories that Conner told the debtor he was obligated to notify the trustee of the inheritance.

Conner's testimony credible, even without the corroborating testimony of Dorey Stabile, which is set forth below.

### Chapter 7 trustee's adversary proceeding

As stipulated, after receiving the insurance proceeds, the debtor opened a bank account in the West Indies in December 2011 and deposited the life insurance proceeds in the amount of $101,000.00 into the account.  In March 2012, the debtor moved from Arkansas to Pennsylvania and on April 12, 2012, purchased a house in Pittsburgh for which she paid $54,500.00 from the life insurance proceeds.

The chapter 7 trustee also testified at the trial.  According to Lee, he wrote the debtor on July 17, 2012, demanding a turnover of the property the debtor received as a result of her mother's death and an accounting of the funds.  (Pl's. Ex. 2.)  Lee subsequently determined that he would most likely be unable to obtain any cash from the debtor because the life insurance proceeds had been spent.  However, Lee filed an adversary proceeding against the debtor for turnover of the estate property and settled the adversary proceeding by accepting a deed to the real property located in Pittsburgh that the debtor purchased with the life insurance proceeds.

### Deposition of Dorey Stabile

Conner's testimony at trial is corroborated by the deposition testimony of Dorey Stabile, which the United States trustee introduced as Trial Exhibit 11.  The United States trustee conducted Stabile's deposition on July 23, 2013.  According to her testimony, Stabile, who lives next door to the debtor in Pittsburgh, has a master's degree in elementary education and a bachelor's degree in dental hygiene.  Although Stabile was not employed at the time of the deposition because of an injury, she was previously employed as a dental hygienist.  She also testified that she had served three years in the U.S. Army.  The following testimony appears in Stabile's deposition.  Richard Sforzini, attorney for the United States trustee, is asking the questions and Stabile is answering.  The page numbers appearing at the end of each statement refer to the page numbers of the deposition.

Q: How long have you lived at 130 Briarwood Drive?
A: Approximately 12 years.
. . . .
Q: Does the defendant in this case, Susan Pokrivnak, live next-door to you?
A: Yes.
Q: Is that at 126 Briarwood Drive?
A: Yes. (page 5)

Q: And did she [the debtor] buy that house, eventually buy that house?
A: Yes, she did.
Q: Do you know when she moved in?
A: In May of 2012.
Q: In May of last year?
A: Yes, sir.
Q: Do you know how much she paid for that house?
A: $54,500.
. . . .
Q: And how do you know that?
A: Because she told me. (page 9)

Q: Did Susan Pokrivnak ever discuss her bankruptcy case with you?
A: Yes.
Q: When did she do that? When was the first time she discussed her bankruptcy case with you?
A: Shortly after moving in next-door.
Q: So, sometime around May of last year?
A: Yes. (page 10)

Q: You didn't know she had filed bankruptcy before that time, before she came and told you about it, did you?
A: No.
Q: She volunteered that information to you; is that correct?
A: Correct. (page 11)

Q: And what did she tell you the first time she discussed her bankruptcy case with you?
A: She was discussing how she came about the money to buy the house, and that was.
Q: And what did she tell you about that?
A: That her mother, she had filed bankruptcy, her mother had died and she inherited money.
Q: Did she tell you anything else about her case at that time?

10

A: That she was supposed to turn the money over to the Bankruptcy Court, but she had no intention of doing so because it was her money. And that she put her money in an overseas bank account because drug dealers and gun runners do it, so why couldn't she? And that's why she . . . . (pages 11-12)

Q: Did she mention discussing the fact that she had received an inheritance with her attorney, with her bankruptcy attorney?

A: Oh, yes, yes, she had let him know that she received it, and he said that she needed to turn it back into--it needed to be turned over, because that was--within six months of her bankruptcy, any money that was received needed to be turned back over to the Bankruptcy Court. And she refused, she said she was not going to do that. So her attorney was aware, but she was not going to do that. It was her money, it was her money, she was adamant that it was her money.

Q: Did she tell you what she had--did she tell you whether she still had the money or whether she had spent it or anything like that?

A: She had told me how much the house was, that she spent $12,000 on hiring a, someone to pack up her things from Arkansas to bring it to Pennsylvania, which an 18 wheeler came and brought things. She had hired people to come and do an asphalt driveway and paint the outside of her house. And also they put a cyclone fence, chain link fence around the front. She told me the dollar amounts for.

Q: These dollar amounts, where did the--I think I know what you're saying, but where did the money come from to pay for these things? To pay for the house and to pay for moving, where did these funds come from?

A: It was from the inheritance from when her mother died.

Q: The money that she said she wasn't going to turn back over to the Bankruptcy Court?

A: Correct, the money from when her mother died that she was not going to turn over to the Bankruptcy Court because it was her money, correct, yes. (pages 12-13)

Q: Did you have another discussion after that about the overseas bank account subsequent to her first telling you about the bankruptcy case?

A: Yes.

Q: And when was that?

A: The earlier part of June of 2012, she came to my door asking if she could use my--if I had a fax machine, because she had to send paperwork to that overseas bank because she needed her pin

11

number reset for her bank card, because she--too many attempts at misentering it, they invalidated it. So, she had to send paperwork over, and it was $150 to have it reset. And I told her she needed to go to FedEx, because I wasn't going to be a party to helping her with anything with this overseas bank account and this money that was supposed to be turned over to the Bankruptcy Court. So, that's where I felt.                                                                    (page 14)

Q:     What was she conveying to you or trying to tell you about putting money into this account?

A:     Well, that's the way to hide money, she's going to hide it and conceal it, and that way no one can get to it. She was gonna keep that money from the government, because, exact words, drug dealers and gunrunners put it in overseas bank accounts, why can't I. That's what I'm gonna do, it's my money.                          (page 15)

Q:     Okay. Did you, after these conversations, the first telling about her bankruptcy in May and when she came next-door in June to ask to use your fax machine, did you ever have occasion to contact anyone in authority about her bankruptcy case?

A:     Yes, I did.

Q:     Would you tell the Court about that, please.

A:     This weighed on my conscious, this was illegal. And I Googled it and I looked up bankruptcy fraud, and I contacted--I looked up Arkansas, because that's where she told me she was from. And I contacted your office by phone, and I received a phone call back and spoke with a, with Micah, Mr.--

Q:     Guster?

A:     Yes, Mr. Guster.

Q:     Micah Guster?

A:     Yes. And I spoke with him approximately June 20th or 21st, and then I Emailed him the information so that he could get a little better, you know, have some documentation of what she told me, then I sent that to your office.                              (pages 15-16)

Q:     After your conversation with Mr. Guster, did Ms. Pokrivnak ever speak to you again about her bankruptcy case:

A:     Yes, she did.

Q:     And when was that?

A:     Probably the end of summer, beginning of fall, yes.

Q:     And what did she say to you at that time?

A:     She said, oh, they found me, they found out about basically--I don't know, they found me, I don't know how they found me.

Q:     Who was she referring to when she said they found her?

A:     Basically you, the Bankruptcy Court, basically that she was found out. And she had mentioned that, you know, I committed bankruptcy fraud.

Q:     Is that what she said to you?

A:     Yes.          (pages 16-17)

Q:     Did she say what she was asked to do with the money that she had received?

A:     Well, previously she knew she was supposed to turn the money over, so at that time she was saying, I have to give the house back.

Q:     Did she tell you that whoever contacted her said that she had to give the house back?

A:     Yes.          (page 17)

Q:     By the way, we've talked about the inheritance or what she had received. Do you know what she received?

A:     She had told me she received $100,000 from her mother's, inheritance from when her mother died.     (pages 17-18)

Q:     Okay, that's a fair answer. What, if anything, did she say about having committed a crime?

A:     She said she committed a felony.

Q:     And she used the word felony?

A:     Absolutely, I committed a felony, almost kind of, like, put her head down in a little, a somber, like, I committed a felony, so yes. (pages 18-19)

Q:     Do you know if Susan Pokrivnak knew anybody in Pennsylvania when she moved there? I'm just asking you if you know.

A:     Yes.

Q:     And what do you know about that?

A:     She said there was a high school classmate that she knew of that possibly lived here, but she never made contact with her. So that's all.     (page 20)

Q:     When you said earlier, just a short while ago, you said what Ms. Pokrivnak did was illegal, what is the basis for your saying that this was illegal?

A:     Well, I don't know anything about bankruptcy, just from what she has told me, that she was supposed to turn the money back over and she did not. That she was, you know, she hid the money in an overseas bank account, because drug dealers and gunrunners do it, it's her money. That her attorney advised her that the money needed to be turned back to the Bankruptcy Court, she signed a document saying that she would--and I forgot, she signed a

13

> document saying that she would turn over any money that she
> received within six months of a bankruptcy, and that she also
> admitted that it's a felony.  I mean, these are--this information
> came all from her.  I mean, it's almost as if she wanted to be, I
> don't know, caught.  I mean, I don't--and I just.
>
> Q:   So, those are the reasons why you've come to that conclusion for
> which you said that this conduct was illegal; is that right?
>
> A:   Correct, yes.                                              (pages 21-22)

(Pl's. Ex. 11.)

Upon cross-examination at the deposition, Stabile admitted to a verbal altercation in May

2013 between Stabile and the debtor on an unrelated matter.  Although this may suggest a

residual animosity between the debtor and Stabile prior to the deposition, the Court notes

that Stabile's testimony is specific and coincides almost directly with the parties'

stipulated facts and the testimony of Conner.  In May 2012, Stabile would not have

known the information to which she testified without that specific information provided

to Stabile by the debtor.  The debtor did not appear at trial to rebut Stabile's testimony

and the Court finds Stabile's testimony credible.


**Conclusions of Law**

Section 727 (d)(2) states that a party in interest has two separate and alternate basis for

revocation of a discharge.  The first basis for revocation of a discharge is for a party in

interest to prove that a debtor knowingly and fraudulently failed to report the acquisition

of or entitlement to such property.  The United States trustee argues that there is

sufficient evidence for revocation of the discharge on this basis.  However, the Court

disagrees.  The debtor advised the trustee during the meeting of creditors of the

possibility of her mother's death.  Furthermore, and more critically, once her mother

died, the debtor did, in fact, advise her attorney of her mother's death and faxed him a

copies of her mother's will and statements of the accounts totaling more than

$100,000.00 into which the insurance proceeds were deposited.  This was exactly what

the trustee asked the debtor to do--to inform her attorney of the "acquisition of any

inheritance."  Even though the debtor did not keep her appointment to go over the details

of this information, she did report the acquisition of the property to her attorney who then, typically, would have transmitted the information to the trustee. It was simply unfortunate that because of the debtor's failure to keep her appointment with her attorney, the attorney inadvertently and unintentionally failed to advise the trustee.

The alternate basis for revocation of a discharge is for a party in interest to prove that the debtor knowingly and fraudulently failed to deliver or surrender such property to the trustee. It is this second provision that the Court finds is the basis for revocation of the discharge in this case. The debtor's present counsel in this adversary proceeding argues that this provision does not apply because most of the assets the debtor received as a result of her mother's death were turned over to the trustee after the adversary proceeding was initiated. This is simply not accurate. The only asset being turned over to the trustee is the house, which was purchased for $54,600.00 and is presently listed for sale at $60,000.00. Although some improvements were made to the house after the debtor purchased it, the evidence is that the estate will not obtain more than $60,000.00 for the house before the costs of the sale are deducted. According to the debtor's counsel, the remainder of the $101,000.00 has been "spent"; it was not turned over to the trustee, and it is not likely to ever be turned over to the trustee. Further, a belated attempt by the debtor to return property of the estate does not mitigate against proof that the debtor fraudulently failed to deliver property of the estate initially. *See Richardson v. Schoemperlen* (*In re Schoemperlen*), 332 B.R. 179, 181 (Bankr. C.D. Ill. 2005) (although debtor timely reported inheritance to trustee, court found that failure to timely turn over inheritance to the trustee was cause to revoke debtor's discharge, even though debtor turned over inheritance on eve of trial).

In this case, the Court finds that the United States trustee proved by a preponderance of the evidence that the debtor knowingly and fraudulently failed to deliver or surrender the life insurance proceeds to the trustee. According to the testimony of both Conner and Stabile, the debtor simply thought it was unfair that she would not get to keep the inheritance from her mother and she went to great lengths to conceal both her own

15

location and the location of the life insurance proceeds. After receiving the proceeds in October 2011, the debtor opened a bank account in the West Indies in December 2011-- just like drug runners and gun dealers, according to the debtor--and moved to Pennsylvania in March 2012. All of this took place after she had been advised three separate times that any inheritance received within 180 days of the filing of her petition would have to be disclosed and turned over to the trustee.[4]

After the debtor received the insurance proceeds, she decided she did not want to do what the bankruptcy code requires of a debtor and turn over the proceeds to the trustee. She did not appear at her appointment with her attorney to discuss her obligations under the code and ultimately moved out of state without leaving forwarding information with her attorney. She set up an overseas account for the sole purpose of concealing the funds and then spent the money on various things, including the house in Pennsylvania. The debtor may have succeeded with her fraudulent scheme had her neighbor, Stabile, not advised the United States trustee's office of the debtor's actions, which the debtor incredibly and voluntarily shared with Stabile.

The Court finds that the United States trustee has carried her burden of proving, by a preponderance of the evidence, both the acquisition of the property that became property of the estate and the knowing and fraudulent failure to deliver the property to the chapter 7 trustee. The debtor did not appear at the trial to rebut the evidence presented by the United States trustee and the Court grants the United States trustee's complaint. The Court revokes the debtor's discharge entered by the Court on August 23, 2011, pursuant to 11 U.S.C. § 727(d)(2). The debtor's actions and her failure to turn over estate property

---

[4]   The first time was at the meeting of creditors when Lee advised the debtor specifically to let Conner know if she received "something as a result of her [mother's] death and that occurs within the next 6 months . . . ." The second time was when the debtor executed the trustee's document acknowledging the debtor's duty to make such disclosure and turnover the proceeds. The third time was when Conner advised the debtor that the proceeds the debtor received as a result of her mother's death needed to be turned over to the trustee.

were done with the purpose of cheating the trustee and the debtor's creditors, all contrary to the requirements of the bankruptcy code.  If a debtor wishes to enjoy the benefits of a bankruptcy discharge and obtain a fresh start, a debtor must comply with the requirements of both the bankruptcy code and the bankruptcy rules.  This debtor complied with neither.

The Court will forward a copy of this Order and Opinion to the U.S. Attorney in accordance with 18 U.S.C. §§ 157, 3057, and 3284.

IT IS SO ORDERED.

Ben Barry
United States Bankruptcy Judge
Dated:  09/06/2013

cc:    Richard  H. Sforzini Jr., attorney for the United States trustee
       Stanley V. Bond and Erin H. Curry, attorneys for the debtor
       William C. Eldridge Jr., United States Attorney